**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| ERIC CINELLI, JOANNA EGGINS, and SATORIA MONLYN, individually and on behalf of a class of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS INCORPORATED and OPTUM360 SERVICES, INC.,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Eric Cinelli, Joanna Eggins, and Satoria Monlyn (collectively, "Plaintiffs"), by and through their undersigned counsel, upon personal knowledge, as to themselves and their own acts, and upon information and belief, as to all other matters, bring this putative class action against Defendants Quest Diagnostics Incorporated ("Quest") and Optum360 Services, Inc. ("Optum360"), (collectively, "Defendants") and allege as follows:

## INTRODUCTION

1.     Plaintiffs, individually and on behalf of all others similarly situated, bring this class action on behalf of all persons whose personal information was compromised as a direct result of Defendants' failure to safeguard millions of patients' highly sensitive protected health information, as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), medical information, and other personally identifiable information, including, but not limited to, names, Social Security numbers, credit card numbers, and bank account information (collectively referred to as "PII").

2.     Specifically, between August 1, 2018 and March 30, 2019, computer hackers gained unauthorized access to approximately 11.9 million Quest patients' PII (the "Data Breach"). Quest announced on June 3, 2019 that American Medical Collection Agency, Inc. ("AMCA"), a billing collections service provider for Quest, had informed Quest that "an unauthorized user had access to AMCA's system containing personal information AMCA received from various entities, including Quest."[1]

3.     Despite the fact that the threat of a data breach has been a well-known risk to Defendants, especially due to the highly valuable and sensitive nature of the data maintained by Defendants, Defendants failed to take reasonable steps to adequately protect the ultra-sensitive PII of its millions of patients. Plaintiffs and the Class must now deal with the direct consequences of Defendants' failures.

4.     The Data Breach was the inevitable result of Defendants' subpar security practices and lax approach to protecting PII. These data security deficiencies were so significant that computer hackers were able to access and maintain access to the PII undetected for over eight months.

5.     Cyber criminals who steal sensitive PII are able to use this information to commit fraud and identify theft through opening bank accounts or loans in class members' names, obtaining medical services using class members' information, filing fraudulent tax returns with class members' information, obtaining government benefits or government-issued identification, and other forms of identity theft and fraud.

---

[1]     Press Release, Quest Diagnostics Incorporated, "Quest Diagnostics Statement on the AMCA Data Security Incident" (June 3, 2019), http://newsroom.questdiagnostics.com/AMCADataSecurityIncident (last visited June 20, 2019).

6.      Despite the heightened risks Plaintiffs and the class members now face because of the theft of their PII, Defendants waited nearly two months from the time the Data Breach was first discovered before disclosing that the Data Breach had occurred. Not only has this delay increased the risk of harm to Plaintiffs and the Class members, Defendants have failed to fully inform the impacted patients of exactly what information was stolen nor the full extent of the Data Breach, depriving them of needed information they can use to take measures to protect themselves.

7.      As a direct result of Defendants' failure to adequately and reasonably protect their PII, Plaintiffs and the Class members have incurred, and will continue to incur, significant damages in taking protective measures to reduce risk of identity theft and other fraudulent activity, and will now always be at an increased risk for identify theft, fraud, and other related harms.

8.      Plaintiffs seek to recover damages and other relief resulting from the Data Breach, including but not limited to, compensatory damages, reimbursement of costs that they and others similarly situated have been forced to bear, and declaratory and injunctive relief to mitigate future harms that are certain to occur in light of the scope of the Data Breach.

## PARTIES

9.      Plaintiff Eric Cinelli is a citizen of the State of Nevada. Mr. Cinelli has been a patient of Quest within the past year. On information and belief, Mr. Cinelli's PII was compromised in the Data Breach, and because of Defendants' failures to prevent the Data Breach, he will be at an increased risk for fraud, identity theft, and any related consequent damages.

10.     Plaintiff Joanna Eggins is a citizen of the State of Florida. Ms. Eggins has been a patient of Quest within the past year. On information and belief, Ms. Eggins' PII was compromised in the Data Breach, and because of Defendants' failures to prevent the Data Breach, she will be at an increased risk for fraud, identity theft, and any related consequent damages.

11.    Plaintiff Satoria Monlyn is a citizen of the State of Florida. Ms. Monlyn has been a patient of Quest within the past year. On information and belief, Ms. Monlyn's PII was compromised in the Data Breach, and because of Defendants' failures to prevent the Data Breach, she will be at an increased risk for fraud, identity theft, and any related consequent damages.

12.    Defendant Quest Diagnostics Incorporated is a corporation organized under the laws of Delaware, and is headquartered at 500 Plaza Drive, Secaucus, New Jersey 07094.

13.    Defendant Optum360 Services, Inc. is a corporation organized under the laws of Delaware, and is headquartered at 13625 Technology Drive, Eden Prairie, Minnesota 55344.

14.    On information and belief, Defendant Optum360, LLC is contracted by Defendant Quest Diagnostics Incorporated for billing collection services.

15.    Non-party American Medical Collection Agency, Inc. is a corporation organized under the laws of Minnesota, and is headquartered at 4 Westchester Plaza, Suite 110, Elmsford, New York 10523.

16.    On information and belief, non-party American Medical Collection Agency, Inc. is a sub-contractor for Defendant Optum360 Services, Inc. for billing collection services.

## JURISDICTION AND VENUE

17.    This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d). The aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 putative Class members (defined below); and minimal diversity exists because the majority of putative Class members, including the named Plaintiffs, are citizens of a different state than Defendants.

18.    This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in and throughout New York, and a portion of the wrongful acts alleged herein were committed in New York, among other venues.

19.    Venue is proper in this District under 28 U.S.C. §1391(a) because a substantial part of the events, acts, and omissions giving rise to the claims of the Plaintiffs occurred in this District.

## FACTUAL ALLEGATIONS

### A.    Background

20.    Quest is "the world's leading provider of diagnostic information services", has thousands of patient centers located around the United States, and purportedly "annually serves one in three adult Americans and half the physicians and hospitals in the United States".[2]

21.    As part of its operations, Quest relies on Optum360 and its sub-vendor, AMCA, for billing collections services.

22.    When patients retain Quest for diagnostic and laboratory services, Quest, along with its vendors and subcontractors, collect, store, and maintain extensive amounts of highly sensitive protected health information and other personally identifiable information about those patients.

### B.    Plaintiffs and the Class Relied on Quest to Adequately Protect Their Sensitive Information

23.    Defendants have a well-established and clear legal duty to act reasonably to protect patients' PII that they collect and possess from exposure to unauthorized third parties.

24.    When Plaintiffs and the Class provided Defendants with their most sensitive information, or when Defendants received such information in some other manner, Plaintiffs and

---

[2]    *Fact Sheet*, QUEST DIAGNOSTICS INCORPORATED, http://newsroom.questdiagnostics.com/index.php?s=30664 (last visited June 20, 2019).

the Class reasonably expected that such information would be stored by Defendants in safe and confidential manner, using all reasonable safeguards and protections.

**C.** **The Data Breach**

25.     On June 3, 2019, Quest announced a data security incident involving its billing collections vendor, AMCA.

26.     According to a Form 8-K that Quest filed with the Securities and Exchange Commission:

> On May 14, 2019, American Medical Collection Agency (AMCA), a billing collections vendor, notified Quest Diagnostics Incorporated ("Quest Diagnostics") and Optum360 LLC, Quest Diagnostics' revenue cycle management provider, of potential unauthorized activity on AMCA's web payment page. Quest Diagnostics and Optum360 promptly sought information from AMCA about the incident, including what, if any, information was subject to unauthorized access.
>
> Although Quest Diagnostics and Optum360 have not yet received detailed or complete information from AMCA about the incident, AMCA has informed Quest Diagnostics and Optum360 that:
>
> - between August 1, 2018 and March 30, 2019 an unauthorized user had access to AMCA's system that contained information that AMCA had received from various entities, including Quest Diagnostics, and information that AMCA collected itself;
>
> - the information on AMCA's affected system included financial information (e.g., credit card numbers and bank account information), medical information and other personal information (e.g., Social Security Numbers);
>
> - as of May 31, 2019, AMCA believes that the number of Quest Diagnostics patients whose information was contained on AMCA's affected system was approximately 11.9 million people….[3]

---

[3]     Quest Diagnostics Incorporated, Current Report (Form 8-K) (June 3, 3019), https://www.sec.gov/Archives/edgar/data/1022079/000094787119000415/ss138857_8k.htm.

27.    Although Quest and Optum360 claimed they first became aware of the breach to AMCA's system on May 14, 2019, the breach was apparently discovered much earlier, as early as March 2019. It wasn't until June 2019 that Quest publicly disclosed the existence of the Data Breach to the public.

**D.    The Data Breach Was the Result of Defendants' Data Security Failures and Was a Foreseeable Risk**

28.    The Data Breach was the direct result of Defendants' actions and choices, which resulted in inadequate data security practices and the breach of systems containing PII.

29.    The harm to Plaintiffs resulting from Defendants' inadequate and insufficient data security systems and practices was at all times entirely foreseeable to Defendants.

30.    Quest was aware of its obligations and duties to protect its patients' PII, as evidenced by the Notice of Privacy Practices that Quest maintains on its website:

> Quest Diagnostics and its wholly owned subsidiaries (collectively "Quest Diagnostics") are committed to protecting the privacy of your identifiable health information. This information is known as "protected health information" or "PHI." PHI includes laboratory test orders and test results as well as invoices for the healthcare services we provide.
>
> Our Responsibilities
>
> Quest Diagnostics is required by law to maintain the privacy of your PHI. We are also required to provide you with this Notice of our legal duties and privacy practices upon request. It describes our legal duties, privacy practices and your patient rights as determined by the Health Insurance Portability and Accountability Act (HIPAA) of 1996. We are required to follow the terms of this Notice currently in effect. We are required to notify affected individuals in the event of a breach involving unsecured protected health information. PHI is stored electronically and is subject to electronic disclosure. This Notice does not apply to non-diagnostic services that we perform such as certain drugs of abuse testing services and clinical trials testing services.[4]

---

[4]    Notice of Privacy Practices, Quest Diagnostics Incorporated, http://www.questdiagnostics.com/hom/privacy-policy/notice-privacy-practices.html (last accessed June 20, 2019).

31.    As reflected on Quest's most recent Form 10-K filing, the costs and risks associated with substandard information technology practices were known to and understood by Quest:

> **Hardware and software failures or delays in our information technology systems, including failures resulting from our systems conversions or otherwise, could disrupt our operations and cause the loss of confidential information, customers and business opportunities or otherwise adversely impact our business.**
>
> IT systems are used extensively in virtually all aspects of our business, including clinical testing, test reporting, billing, customer service, logistics and management of medical data. Our success depends, in part, on the continued and uninterrupted performance of our IT systems. A failure or delay in our IT systems could impede our ability to serve our customers and patients and protect their confidential personal data. Despite redundancy and backup measures and precautions that we have implemented, our IT systems may be vulnerable to damage, disruptions and shutdown from a variety of sources, including telecommunications or network failures, system conversion or standardization initiatives, human acts and natural disasters. These issues can also arise as a result from failures by third parties with whom we do business and for which we have limited control. Any disruption or failure of our IT systems could have a material impact on our ability to serve our customers and patients, including negatively affecting our reputation in the marketplace.[5]

32.    Quest was also acutely aware that its systems are "subject to potential cyber attacks or other security breaches" that could result in "unauthorized persons misappropriating… confidential data, including patient data that we obtain, transmit and store on and through our IT systems." *Id.*

33.    And Quest was aware that the same cyber security risks apply to its vendors and sub-contractors:

> Third parties to whom we outsource certain of our services or functions, or with whom we interface, may store our confidential, patient data or other confidential information, are also subject to the risks outlined above. A

---

[5]    Quest Diagnostics Incorporated, Annual Report at 35 (Form 10-K) (filed Feb. 21, 2019), https://www.sec.gov/Archives/edgar/data/1022079/000102207919000030/dgx1231201810-k.htm.

breach or attack affecting these third parties could also harm our business, results of operations and reputation.

*Id.* at 36.

34.    Perhaps most telling of all, however, is the fact that Quest previously suffered a data breach several years ago: "In December 2016, we reported that an internet application on our IT network had been the target of an external cyber attack, resulting in the theft of certain patient data." *Id.* at 35. And Quest has regularly "experienced other attacks, viruses, attempted intrusions or similar problems", of which Quest understood the incumbent consequences of failing to vigilantly protect against. *Id.*

35.    Moreover, Defendants were aware that the medical industry is a prime target for cyber criminals, and that the medical industry has already experienced a substantial number of data breaches targeting patient-related data, including several high profile breaches occurring at Anthem Inc., Premera Blue Cross, Excellus Health Plan Inc., and the University of California, Los Angeles Health, among others, which each resulted in the loss of millions of individuals' sensitive information.[6]

36.    Thus, Defendants knew, given the vast amount of PII they managed and maintained, and through personal experience, that they were a target of attempted cyber and other security threats, and therefore understood the risks posed by their insecure data security practices and systems. They also understood the need to safeguard PII and the impact a data breach would have on their patients, including Plaintiffs and the Class.

---

[6]    *See* HIPAA Journal, "Healthcare Data Breach Statistics", https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited June 20, 2019).

E.    **Defendants Violated Federal Security Requirements and Other Industry Standards**

37.    Defendants have an unambiguous duty to maintain the confidentiality of patients' PII and to prevent any third-party misuse or access to such information. Defendants' actions and failure to safeguard patients' information violated federal law, federal data security standards, and industry standards, as well as an established legal duty to not act negligently when handling and storing PII.

F.    **Defendants Failed to Comply with HIPAA**

38.    The lax data security practices and systems employed by Defendants which resulted in the Data Breach indicate that Defendants failed to comply with HIPAA regulations and mandated safeguards. Title II of HIPAA (42 U.S.C. §§1301 *et seq.*) require the Department of Health and Human Services to establish standards and rules for how PII should be safeguarded. Defendants have failed to comply with those safeguards by, *inter alia*:

a.    Failing to adequately protect patients' PII;

b.    Failing to properly monitor data security systems for existing intrusions;

c.    Failing to ensure vendors and other third-parties entrusted with PII were employing reasonable data security practices;

d.    Failing to maintain adequate data security systems to prevent intrusions and other forms of cyber attacks or data loss;

e.    Failing to ensure the confidentiality and integrity of electronic protected health information that was created, received, maintained and/or transmitted, pursuant to 45 C.F.R §164.306(a)(1);

f.    Failing to implement policies and procedures for electronic systems where electronic protected health information was stored to allow access only to

persons or software programs that have been granted access, pursuant to 45 C.F.R. §164.312(a)(1);

g.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, pursuant to 45 C.F.R. §164.308(a)(1);

h.    Failing to ensure compliance with security rules for workforces, pursuant to 45 C.F.R. §164.306(a)(94);

i.    Failing to protect against reasonably anticipated disclosures or uses of electronic protected health information that are not permitted under privacy rules, pursuant to 45 C.F.R. §164.306(a)(3);

j.    Failing to protect against reasonably anticipated hazards or threats to the security or integrity of electronic protected health information, pursuant to 45 C.F.R. §164.306(a)(2);

k.    Failing to identify and respond to suspected or known security incidents, including a failure to mitigate harmful effects of security incidents that are known, pursuant 45 C.F.R. §164.308(a)(6)(ii);

l.    Failing to adequately train all workforce members, including third-party contractors, on protected health information policies and procedures as necessary and appropriate for the workforce to carry out their functions and maintain security, pursuant to 45 C.F.R. §§164.530(b) and 308(a)(5); and,

m.    Failing to adequately design, implement, and enforce policies and procedures that establish physical and administrative safeguards for protected health information, pursuant to 45 C.F.R. §164.530(c).

**G.      Defendants Failed to Comply with Federal Trade Commission Requirements**

39.      According to the Federal Trade Commission ("FTC"), the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act of 1914 (the "FTC Act"), 15 U.S.C. §45.

40.      In 2007, the FTC published guidelines that establish reasonable data security practices for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone may be trying to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

41.      The FTC also has published a document, entitled "FTC Facts for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

42.      And the FTC has issued orders against businesses that failed to employ reasonable measures to secure data. These orders provide further guidance to businesses with regard to their data security obligations.

43.      In the months and years leading up to the Data Breach, and during the course of the breach itself, Defendants failed to follow the guidelines recommended by the FTC. Further, by

failing to have reasonable data security measures in place, Defendants engaged in unfair acts or practices within the meaning of Section 5 of the FTC Act.

**H.    Defendants Failed to Comply with Industry Standards for Data Security**

44.    In addition to the sensitive health and medical information that was compromised in the Data Breach, Defendants' permitted the theft of other sensitive PII, including credit card numbers and bank account information.

45.    Defendants' had a duty of care to maintain the confidentiality of Plaintiffs and the Class members' credit card numbers and bank account information.

46.    The Payment Card Industry Security Standards Council promulgates a set of minimum requirements, which apply to all organizations that store, process, or transmit Payment Card Data. This standard, known as the Payment Card Industry Data Security Standard ("PCI DSS"), is the industry standard governing the security of payment card data. It sets the minimum level of what must be done, not the maximum.

47.    PCI DSS v.3.2, the version of the standard in effect beginning in April 2016, imposes the following 12 "high-level" mandates:

### PCI Data Security Standard – High Level Overview

| | | |
|---|---|---|
| Build and Maintain a Secure Network and Systems | 1. | Install and maintain a firewall configuration to protect cardholder data |
| | 2. | Do not use vendor-supplied defaults for system passwords and other security parameters |
| Protect Cardholder Data | 3. | Protect stored cardholder data |
| | 4. | Encrypt transmission of cardholder data across open, public networks |
| Maintain a Vulnerability Management Program | 5. | Protect all systems against malware and regularly update anti-virus software or programs |
| | 6. | Develop and maintain secure systems and applications |
| Implement Strong Access Control Measures | 7. | Restrict access to cardholder data by business need to know |
| | 8. | Identify and authenticate access to system components |
| | 9. | Restrict physical access to cardholder data |
| Regularly Monitor and Test Networks | 10. | Track and monitor all access to network resources and cardholder data |
| | 11. | Regularly test security systems and processes |
| Maintain an Information Security Policy | 12. | Maintain a policy that addresses information security for all personnel |

Furthermore, PCI DSS v.3.2 sets forth detailed and comprehensive requirements that must be followed to meet each of the 12 mandates.

48.    Among other things, PCI DSS required Defendants to properly secure payment card data; not store cardholder data beyond the time necessary to authorize a transaction; implement proper network segmentation; restrict access to Payment Card Data to those with a need to know; and establish a process to identify and timely fix security vulnerabilities. As discussed herein, Defendants failed to comply with these requirements.

**I.    Plaintiffs and the Class Have Been, Are Currently Being, and Will Be Harmed by the Data Breach**

49.    The Data Breach has inflicted immediate, hard costs on Plaintiffs and members of the Class.

50.    Defendants failed to follow HIPAA-mandated safeguards and industry standards, and failed to effectively monitor their security systems to ensure the safety of patient information. Defendants' substandard security protocols and failure to adequately monitor for unauthorized intrusion, as well as a failure to monitor third-parties with access to or who possess patients' PII,

caused Plaintiffs and the Class members' PII to be compromised for a significant period of time without detection by Defendants.

51.     Plaintiffs and the Class have incurred, and will continue to incur, substantial damage because of Defendants' failures to meet reasonable standards of data security.

52.     As a result of the Defendants' Data Breach, Plaintiffs and the Class are required to incur costs for protective measures such as credit monitoring, cancelling payment cards, changing or closing accounts, investigating fraudulent activity, and taking other steps to protect themselves in an effort to reduce the risk of future, but certainly impending, identity theft, loan fraud, and other fraudulent transactions.

53.     Sensitive personal and financial information, like the information compromised in this breach, is extremely valuable. Criminals have gained access to highly sought-for PII. They can now use this data to steal the identities of the patients whose information has been compromised or sell it to others who plan to do so. In this manner, unauthorized third-parties can assume the stolen identities (or create entirely new identities from scratch) to obtain medical services, make transactions or purchases, open credit or bank accounts, apply for loans, forge checks, commit immigration fraud, obtain a driver's license in the patient's name, obtain government benefits, or file a fraudulent tax return. A report by the Department of Justice found that 86% of identity theft victims in 2014 experienced the fraudulent use of existing account information, including credit card and bank account information.[7]

54.     Consumers inevitably face significant emotional distress after theft of their identity. The fear of financial harm can cause significant stress and anxiety for many consumers. According

---

[7]     Erika Harrell, Ph.D., *Victims of Identity Theft, 2014*, U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STAT. (rev. Nov. 13, 2017), https://www.bjs.gov/content/pub/pdf/vit14.pdf.

to the DOJ, an estimated 36% of identity theft victims experienced moderate or severe emotional distress as a result of the crime. *Id.*

## CLASS ALLEGATIONS

55.     Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following nationwide class, defined as follows:

> All individuals legally residing in the United States who used Quest's services, provided PII to Quest, and whose PII was compromised as a result of the Data Beach announced by Quest on June 3, 2019.

**The Rule 23(a) Factors**

56.     This action may properly be maintained as a class action and satisfies the requirements of Fed. R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy.

57.     <u>Numerosity</u>: The members of the Class are so numerous that joinder of all individual members in one action would be impracticable.  The disposition of the individual claims of the respective class members through this class action will benefit both the parties and the Court, and will facilitate judicial economy.

58.     <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the absent members of the Class and have a common origin and basis. Plaintiffs and Class members are all persons injured by Defendants' Data Breach. Plaintiffs' claims arise from the same practices and course of conduct giving rise to the claims of the absent Class members and are based on the same legal theories, namely, the Defendants' Data Breach. If prosecuted individually, the claims of each Class member would necessarily rely upon the same material facts and legal theories and would seek the same relief.

59.    <u>Common Questions of Fact and Law</u>: There are common questions of law and fact that predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to:

a.    whether Defendants owed a duty to Plaintiffs and the members of the Class to protect PII;

b.    whether Defendants failed to provide reasonable security to protect PII;

c.    whether Defendants negligently or otherwise improperly allowed PII to be accessed by third parties;

d.    whether Defendants failed to adequately notify Plaintiffs and members of the Class that their data systems were breached;

e.    whether Plaintiffs and the members of the Class were injured and suffered damages and ascertainable losses;

f.    whether Defendants' actions, which failed to reasonably secure Plaintiffs and the Class member's PII, proximately caused the injuries suffered by Plaintiffs and the members of the Class;

g.    whether Plaintiffs and members of the Class are entitled to damages and, if so, the measure of such damages; and,

h.    whether Plaintiffs and the members of the Class are entitled to declaratory and injunctive relief.

60.    <u>Adequacy of Representation</u>: Plaintiffs will fully and adequately assert and protect the interests of the absent Class members and have retained Class counsel who have considerable experience in class action litigation concerning corporate data security and possess the resources

necessary to prosecute this case. Neither Plaintiffs nor their attorneys have any interests contrary to or conflicting with the interests of the absent Class members.

**The Rule 23(b)(2) and (b)(3) Factors**

61.     The questions of law and fact common to all Class members predominate over any questions affecting only individual Class members.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the absent Class members' claims is economically infeasible and procedurally impracticable. Class members share the same factual and legal issues, and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues. Class treatment will also permit Class members to litigate their claims where it would otherwise be too expensive or inefficient to do so. Plaintiffs know of no difficulties in managing this action that would preclude its maintenance as a class action.

63.     Contact information for each Class member, on information and belief, is readily available, facilitating notice of the pendency of this action.

64.     Defendants have acted on grounds that apply generally to the Class as a whole, making injunctive relief appropriate on a class wide basis, pursuant to Fed. R. Civ. P. 23(b)(2).

**CAUSES OF ACTION**

**COUNT I**
**Negligence**

65.     Plaintiffs incorporate by reference each and every allegation contained in the previous paragraphs.

66.     In order to retain Quest's services, Quest required Plaintiffs and the Class to provide their PII. Quest then forwarded this information Optum360 and/or AMCA.

67.     Plaintiffs and the Class provided their PII to Quest with the understanding that the PII would be treated with reasonable measures to secure and safeguard it, including by Quest's vendors and sub-contractors.

68.     Defendants undertook a duty to exercise reasonable care in protecting and securing Plaintiffs and the Class members' PII from inadvertent disclosure, misuse, and from being compromised, lost, or stolen.

69.     Defendants' duty also included a responsibility to design, maintain, and ensure security practices and systems are implemented in a manner to adequately safeguard PII, consistent with HIPAA, the FTC Act, and industry standards.

70.     Defendants were also responsible for ensuring that employees who were tasked with maintaining PII were adequately trained to handle PII, including training on cyber security and the protection of PII.

71.     Defendants were fully aware of the sensitive nature of the PII entrusted to them and the risks as well as potential harms that Plaintiffs and the Class would suffer if their PII were compromised.

72.     Defendants knew or should have known of the risks associated with the collection and storage of PII, as well as the magnitude of providing adequate safeguards for PII, especially in the current climate of rampant cybercrimes and hacking occurring in the medical industry.

73.     Defendants' conduct created a foreseeable risk of harm to Plaintiffs and the Class by failing to take measures to prevent the Data Breach and failing to comply with HIPAA, the FTC Act, and industry standards for the safeguarding of PII.

74.    Defendants' duty to use reasonable security measures to prevent the Data Breach arose as a result of the special relationship that existed between Defendants and the Plaintiff and the members of the Class. The special relationship arose because Plaintiff and the members of the Class entrusted Defendants with their confidential patient data, as part of the diagnostic services process. Only Defendants were in a position to ensure that their systems were sufficient to protect against the harm to Plaintiff and the members of the Class from a data breach.

75.    Defendants' duty to use reasonable security measures arose under HIPAA, pursuant to which Defendants are required to "reasonably protect" confidential patient data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. §164.530(c)(1). The confidential patient data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

76.    Defendants' duty to use reasonable security measures arose under Section 5 of the FTC Act, 15 U.S.C. §45, which prohibits "unfair… practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential patient data by healthcare providers like Defendants. The FTC publications and data security breach orders described above further form the basis of Defendants' duty.

77.    Defendants' duty to use reasonable care in protecting PII arose not only as a result of the common law and the statutes and regulations described above, but also because they had committed to comply with industry standards for the protection of confidential patient data.

78.    Plaintiffs and the Class were not in a position to protect the PII that they provided to Defendants, but instead relied on Defendants to protect against the harms that Plaintiffs and the Class suffered as a result of the Data Breach.

79.    Defendants have admitted that, as a result of the Data Breach, Plaintiffs and the Class members' PII was compromised and disclosed to unauthorized third parties.

80.    Defendants have breached their duty to Plaintiffs and the Class by failing to exercise reasonable care to safeguard the Plaintiffs and the Class members' PII while in Defendants' possession, by failing to implement adequate policies and systems to prevent the Data Breach, and by failing to adequately disclose the existence and scope of the Data Breach to Plaintiffs and the Class.

81.    But for Defendants' negligence in breaching their duties owed to Plaintiffs and the Class, Plaintiffs and the Class members' would not have had their PII compromised.

82.    Defendants' failure to adequately implement measures to secure PII establishes a close temporal and causal connection to the harms suffered or risk of imminent harm suffered by Plaintiffs and the Class.

83.    As a consequence of Defendants' negligence, Plaintiffs and the Class are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

**COUNT II**
**Negligence *Per Se***

84.    Plaintiffs incorporate by reference each and every allegation contained in the previous paragraphs.

85.    HIPAA was designed to protect the privacy of personal medical information by limiting its disclosure. Specifically, under HIPAA, Defendants are required to "reasonably protect" confidential patient data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. §164.530(c)(1). Additionally, under HIPAA, Defendants are obligated to provide notification of a breach of protected health information. 45 C.F.R.

§§164.404 and 164.410. The confidential patient data at issue in this case constitutes "protected health information" within the meaning of HIPAA.

86.    HIPAA seeks to protect the privacy of protected confidential patient data by prohibiting any voluntary or involuntary use or disclosure of such data in violation of the directives set out in the statute and its regulations, and requiring notification in all instances when such data is breached.

87.    Defendants are HIPAA-covered entities.

88.    As described above, Defendants violated HIPAA by failing to maintain the confidentiality of their protected health information and to provide timely notification of the breach of such data.

89.    Defendants' violation of HIPAA constitutes negligence *per se*.

90.    Section 5 of the FTC Act prohibits "unfair. . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII, such as the credit card numbers and bank account information that were compromised in the Data Breach. The FTC publications and orders described above also form part of the basis of Defendants' duty.

91.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect credit card and bank account PII and by not complying with applicable industry standards, including PCI-DSS, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII they obtained and stored, length of time the information was maintained on an apparently vulnerable system, and foreseeable consequences of a data breach at a major, international medical services company, including, specifically, the immense damages that would result to patients.

92.     Defendants' violations of Section 5 of the FTC Act constitute negligence *per se*.

93.     Plaintiffs and members of the Class are consumers and are within the class of persons that Section 5 of the FTC Act was intended to protect.

94.     The harm that has occurred is the type of harm the FTC Act was intended to guard against. Indeed, the FTC has pursued over 50 enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and the Class.

95.     As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injury, including, but not limited to, the ongoing, imminent, and impending threat of identity theft crimes, fraud and abuse, resulting in monetary loss and economic harm; the loss of the confidentiality of the compromised patient data; and investing time and money in cancelling payment cards, changing or closing accounts, securing credit monitoring and identity theft insurance, and taking other steps to monitor their identities and protect themselves.

## COUNT III
## Declaratory and Equitable Relief

96.     Plaintiffs incorporate by reference each and every allegation contained in the previous paragraphs.

97.     Under the Declaratory Judgment Act, 28 U.S.C. §§2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, which are tortious and violate the terms of the federal and state statutes described herein.

98.     Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.  Defendants continue to owe a legal duty to secure patient PII;

b.  Defendants continue to breach this legal duty by failing to employ reasonable measures to secure patient PII; and,

c.  Defendants' ongoing breaches of their legal duty continue to cause Plaintiffs and the Class harm.

99.  The Court also should issue corresponding injunctive relief requiring Defendants to employ adequate security protocols, consistent with industry standards, to protect PII. Specifically, this injunction should, among other things, direct Defendants to:

a.  Take measures to strengthen their data security systems and practices to ensure PII is adequately safeguarded;

b.  Undertake annual or other periodic audits of their data security systems and practices; and,

c.  Provide free credit monitoring services to the Plaintiffs and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court:

A.  Certify the Class appoint Plaintiffs and Plaintiffs' counsel to represent the Class;

B.  Enter a monetary judgment in favor of Plaintiffs and the Class to compensate them for the injuries they have suffered, together with pre-judgment and post-judgment interest and treble damages and penalties where appropriate;

C.  Enter a declaratory judgment as described herein;

D.  Grant the injunctive relief requested herein;

E.      Award Plaintiffs and the Class reasonable attorneys' fees and costs of suit, as allowed by law; and,

F.      Award such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  June 20, 2019                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**


*/s/ Joseph P. Guglielmo*
Joseph P. Guglielmo
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel: (212) 223-6444
Fax: (212) 223-6334
jguglielmo@scott-scott.com

Erin Green Comite
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Tel:  (860) 537-5537
Fax: (860) 537-4432
ecomite@scott-scott.com

Gary F. Lynch
**CARLSON LYNCH, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
glynch@carlsonlynch.com

Katrina Carroll
**CARLSON LYNCH, LLP**
111 W. Washington Street
Suite 1240
Chicago, IL 60602
Tel: (312) 750-1265
kcarroll@carlsonlynch.com

Jonathan M. Jagher
Kimberly A. Justice
**FREED KANNER LONDON  & MILLEN, LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com
kjustice@fklmlaw.com

*Attorneys for Plaintiff*